**UNITED STATES of America, Plaintiff,**

v.

**John W. MARSH, Sean Marsh & Heather Marsh as Trustees of the Marsh Trust, and Bank of Hawaii, Defendants.**

**No. Civ. 99–00355 SOM.**

United States District Court, D. Hawai'i.

Aug. 30, 2000.

Bernard J. Knight, Jr., U.S. Department of Justice, Washington, DC, for plaintiff.

Stephen P. Pingree, Richard P. McClellan, III, Honolulu, HI, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

MOLLWAY, District Judge.

This is an action by Plaintiff United States of America ("United States") against Defendants John Marsh, Sean Marsh and Heather Marsh, as trustees of the Marsh Trust, and Bank of Hawaii to reduce to judgment the unpaid federal employment and unemployment taxes assessed against John Marsh and to foreclose on federal tax liens on two parcels of real property conveyed by John Marsh to the Marsh Trust.

On July 22, 1999, John Marsh filed a Counterclaim against the United States for damages for unauthorized collection practices under 26 U.S.C. § 7433. John Marsh claimed that the IRS had acted improperly in attempting to collect the taxes it claims John Marsh owes. Because all of the allegations contained in the Counterclaim were either time-barred or not cognizable, the court dismissed the Counterclaim.

On June 13, 2000, the court granted summary judgment to the United States on Count I of the Complaint, reducing to judgment unpaid federal employment and unemployment taxes owed by John Marsh. This was done in the Order Denying Defendant John W. Marsh's Motion to Dismiss for Lack of Jurisdiction and Granting the United States' Motion for Partial Summary Judgment on Count I of the Complaint (Judgment for Unpaid tax Assessments). Consequently, the amount or calculation of the assessments made against John Marsh by the IRS is no longer at issue. The only issue for trial is whether the United States can foreclose its tax liens against two parcels of real property that John Marsh transferred to the Marsh Trust in 1994 under one or more of three theories: 1) that Marsh fraudulently conveyed the real properties to the Marsh Trust, 2) that the Marsh Trust holds title to the real properties as the nominee of John Marsh, or 3) that the Marsh Trust is a sham.

The parties have stipulated that any interest Bank of Hawaii has in the properties is to be addressed by post-trial motion. A nonjury trial was held on August 29, 2000. The trial was conducted pursuant to this court's civil nonjury trial procedures. Those procedures provide for direct examination to be presented by way of written declaration, and for witnesses to be available for live cross-examination and live redirect examination unless written cross-and/or redirect examinations are agreed to. Four witnesses were presented at trial by the government in its case-in-chief. They were Defendants John Marsh, Sean Marsh, and Heather Manuel, and John Marsh's attorney, Hayden Burgess. The Defendants put on no additional witnesses.

For the reasons set forth below, this court orders that the two properties in issue be foreclosed on the ground that they are held by the Marsh Trust as John Marsh's nominee.

### FINDINGS OF FACT

1. By "deed" dated March 6, 1967, a copy of which was received in evi-

dence as Exhibit 2, John W. Marsh and his wife, Carol Lee Marsh ("Carol Marsh"), acquired the residential property located at 2472 Komo Mai Drive, Pearl City, Hawaii, "as tenants by the entirety with full right of survivorship." This Pearl City property is referred to in these findings as the "Residential Property." Declaration of John Marsh ¶¶ 1, 8 ("J. Marsh Dec."); Exhibit 2.

2. John Marsh and Carol Marsh have two children, Sean Marsh ("Sean Marsh") and Heather Marsh (now Heather Manuel) ("Heather Manuel"). J. Marsh Dec. ¶ 2; Testimony of John Marsh. Sean was born in 1965, and is married to Bernadine Marsh, with whom he has two daughters, ages 9 and 5. Testimony of Sean Marsh. Sean is a lineman with a telephone company and has worked in the past with building contractors. Heather was born in 1971. She has a bachelor's degree in liberal arts and is married. Heather's husband is a plumber, and Heather is a flight attendant. Testimony of Heather Manuel.

3. In 1965, John Marsh joined the Honolulu Police Department. He progressed to the rank of Sergeant and received commendations for, among other things, foiling an attempted rape at a public housing project in urban Honolulu. He continued to work with HPD until his retirement in 1992. Testimony of John Marsh.

4. While still with HPD, John Marsh started a masonry contracting business, named S & H Masonry. *Id.*

5. In approximately 1985, John Marsh and Carol Marsh were audited by the Internal Revenue Service ("IRS"). Initially, the IRS asserted that, for the tax years 1981 through 1984, they owed approximately $114,000 in personal taxes. After John Marsh and Carol Marsh retained an accountant to represent them in the audit, the IRS conceded that the amount due was approximately $15,000. *Id.*

6. In the spring of 1986, John Marsh applied for and obtained a personal line of credit from Bank of Hawaii, secured by a first mortgage on the Residential Property. The credit limit was $40,000. J. Marsh Dec. ¶ 16; Exhibit 8.

7. S & H Masonry did not always have full-time work and had periods without any jobs or with only small jobs. Testimony of John Marsh.

8. In 1990, the IRS was examining whether S & H Masonry had failed to pay employment taxes for persons who performed S & H Masonry work. In a letter dated July 12, 1990, Marsh told the IRS that he was aware of the " 'Employment Tax issue' existing for 1985 through 1988." Exhibit 11; J. Marsh Dec. ¶ 19. In the letter, Marsh stated that he was not a "TAXPAYER" for purposes of the Internal Revenue Code and therefore "NOT SUBJECT TO YOUR JURISDICTION." Exhibit 11.

9. In 1990 or 1991, John Marsh and his accountant met with three IRS representatives to discuss S & H Masonry tax issues. John Marsh took the position that, under the IRS' 20–point test to determine whether a person was an employee or an independent contractor, S & H Masonry workers were independent contractors and therefore S & H Masonry was not liable for employee-related taxes. John Marsh said that, at the end of the meeting, he believed that the IRS was satisfied with his explanation and was abandoning its inquiry into the status of S & H Masonry workers' tax status. Testimony of John Marsh.

10. By "warranty deed" dated June 27, 1991, John Marsh and Carol Marsh acquired a vacant lot on the Big Island of Hawaii ("Vacant Lot") as tenants by the entirety. A copy of the warranty deed to the Vacant Lot was received in evidence as Exhibit 4. This deed resulted from John and Carol

Marshes' purchase of the Vacant Lot in the 1970s by an agreement of sale. They made periodic payments until 1991, when, having paid in full, they received the warranty deed. They purchased the Vacant Lot so that they would have a second piece of real estate, and each of their two children could then be assured of ultimately owning real estate, with the children to decide which child would take which parcel. Testimony of John Marsh.

11. In a letter dated May 29, 1992, John Marsh wrote to the IRS stating that he was aware of an IRS criminal investigation against him for the years 1986 through 1989. Exhibit 12; J. Marsh Dec. ¶ 20. John Marsh said in the letter that he was not a "TAX-PAYER" for purposes of the Internal Revenue Code and that the IRS had no jurisdiction over him. *Id.*

12. In May 1992, John Marsh was aware that the IRS was conducting a criminal tax investigation of him. J. Marsh Dec. ¶ 20.

13. John Marsh has always believed that he is not required nor obligated to pay taxes to the United States because the United States has no jurisdiction to collect taxes from him. J. Marsh Dec. ¶ 21.

14. In 1994, John Marsh was indicted for tax evasion relating to his personal income tax returns. John Marsh was acquitted on all counts. Testimony of John Marsh.

15. On November 22, 1994, Carol Marsh died. J. Marsh Dec. ¶ 3.

16. Carol Marsh's death was unexpected. Testimony of John Marsh, Heather Manuel. Carol Marsh had been diagnosed with cancer a year before her death, but was in remission. Testimony of John Marsh. Carol Marsh died days after a mistaken emergency room diagnosis. *Id.*

17. Before Carol Marsh died, she asked John Marsh to take care of their children and to remember what they had discussed in the past. *Id.*

John Marsh believed that Carol Marsh was referring to discussions he had had with Carol Marsh about the disposition of their property. Each had expressed a desire to have their property go to their children at their deaths. *Id.* John Marsh had considered the possibility that, as a police officer, he might die before his wife, and that his wife might remarry. He had had the wish that his property go to his children even if Carol remarried. *Id.*

18. Even before their mother died, Sean Marsh and Heather Manuel had been aware that their father, John Marsh, was having problems with the IRS. S. Marsh Dec. ¶ 4; H. Manuel Dec. ¶ 4.

19. On December 9, 1994, less than three weeks after Carol Marsh's death, John Marsh executed trust documents creating the Marsh Trust. John Marsh had consulted with Hayden Burgess, an attorney licensed in Hawaii, who drafted the necessary legal documents for John Marsh to establish a trust. Declaration of Hayden Burgess ("Burgess Dec.") ¶¶ 3, 7; Exhibit 1. John Marsh suggested a trust as the best vehicle to preserve his assets. Burgess Dec. ¶ 9; Testimony of Hayden Burgess. Burgess knew from John Marsh that the IRS was asserting that John Marsh owed unpaid taxes. Burgess Dec. ¶ 4. When the trust was created, Burgess also knew that John Marsh was being investigated by the IRS for criminal tax violations. *Id.* ¶ 5.

20. John Marsh was the settlor of the Marsh Trust, and Sean Marsh and Heather Manuel were its sole trustees and beneficiaries. Under the trust's terms, John Marsh retained no legal or equitable interest in the corpus of the Marsh Trust. A copy of the declaration of trust was received in evidence as Exhibit 1. At the time the trust was formed, John Marsh did not

tell Sean and Heather about its existence or that any property had been transferred to the Marsh Trust.

21. By "quitclaim deed" dated December 9, 1994, a copy of which was received in evidence as Exhibit 3, John Marsh conveyed the Residential Property to the Marsh Trust. The conveyance was recorded by the Bureau of Conveyances on December 23, 1994. No money or other consideration was paid to John Marsh in exchange for the Residential Property. J. Marsh Dec. ¶ 11.

22. By "quitclaim deed" dated December 9, 1994, and recorded with the State of Hawaii Bureau of Conveyances on December 23, 1994, John Marsh conveyed the Vacant Lot to the Marsh Trust. J. Marsh Dec. ¶ 12; Exhibit 5. No money or other consideration was paid to John Marsh in exchange for the Vacant Lot. J. Marsh Dec. ¶ 13.

23. By "quitclaim deed" dated December 9, 1994, John Marsh transferred title to real property located in San Diego, California ("San Diego Property"), to the Marsh Trust. A copy of this "quitclaim deed" was received in evidence as Exhibit 6. The Marsh Trust paid no money or other consideration to Marsh for the San Diego Property. J. Marsh Dec. ¶ 14.

24. By "quitclaim deed" dated August 11, 1999, the San Diego Property was transferred by Sean and Heather Manuel, as trustees of the Marsh Trust, to Stephen Pingree ("Pingree"), as shown by Exhibit 7. The San Diego Property was transferred to Pingree to pay John Marsh's legal fees. J. Marsh Dec. ¶ 15. As the present case is the only one against John Marsh known to this court to be the subject of legal fees in 1999, the fees were apparently being incurred in the present case. Because of what appears to be the identity of interest between John Marsh and the Marsh Trust in the present case, payment of Pingree's legal fees also appears to have benefitted the Marsh Trust. Thus, while it was John Marsh who decided that the San Diego Property would be transferred to Pingree, it is not at all clear that the fees for John Marsh were separable from the fees incurred by the Marsh Trust, which was also represented by Pingree. *Id.*

25. Sean Marsh and Heather Manuel were not involved in the formation or creation of the Marsh Trust. S. Marsh Dec. ¶ 2; H. Manuel Dec. ¶ 3.

26. In November 1994, John Marsh was receiving a contingent monthly retirement benefit of approximately $2000 per month from the State of Hawaii Employees' Retirement System.[1]

27. After Carol Marsh's death, Sean Marsh, his wife, and their two children lived at the Residential Property. Sean Marsh has lived at the Residential Property since his birth. Testimony of Sean Marsh. Heather Manuel resided at the Residential Property from 1971 until 1995, when she purchased a home in Makakilo. H. Manuel Dec. ¶ 2; Testimony of Heather Manuel.

28. After Carol Marsh's death, John Marsh stayed at the Residential Property from time to time, but was more often absent than present.

29. In 1995, John Marsh spent two to three months in Hawaii. Through most of 1996, he traveled on the mainland. When he was on Oahu in 1995 and 1996, he slept at the Residential Property. In 1997, he had jobs on the Big Island and Molokai and stayed at hotels, on the job site, and at a friend's house when not on Oahu. He also spent time on the Big Island researching Native Hawaiian burial sites. After 1997, he also stayed at a

---

1. The retirement benefits were discussed in this court's Order Granting Summary Judgment on the Counterclaim filed on March 2, 2000.

"lady friend's" home. Testimony of John Marsh. John Marsh has no other residence on Oahu. *Id.*

30. John Marsh would come and go as he pleased from the Residential Property. It "was his home as long as he wanted it to be"; he was always welcome. He did not have to ask permission. *Id.*

31. When John Marsh stayed at the Residential Property, he slept on the living room floor and showered in a shower attached to the garage. *Id.* John Marsh kept some of his personal effects at the Residential Property and received mail at that address. *Id.* He had a key to the property and was free to eat any food that was there.

32. After Carol Marsh's death, Sean Marsh performed the routine maintenance of the Residential Property. Testimony of John Marsh & Sean Marsh. Sean Marsh made repairs to the plumbing and the roof. He landscaped and paid for recarpeting. He also paid the real property taxes. Testimony of Sean Marsh.

33. Heather Manuel has visited and stayed overnight at the Residential Property as she wished. Testimony of Heather Manuel.

34. Since the death of Carol Marsh, Heather Manuel has made contributions to the upkeep of the Residential Property by paying for renovations to the roof, an electric fan in the living room, painting and renovation of the bathroom, as well as maintenance of the yard. She estimated that, besides lending her labor, she has spent about $3,000 on materials for the above renovations and for living room furniture and a television she bought for the Residential Property. Testimony of Heather Manuel.

35. The electric, telephone, and water service provided to the Residential Property remained in the name of John Marsh after the title to the Residential Property was transferred to the Marsh Trust. J. Marsh Dec. ¶ 18; S. Marsh Dec. ¶ 7. Sean Marsh, however, paid the utility bills. Testimony of Sean Marsh.

36. John Marsh has never paid any rent to the Marsh Trust. J. Marsh Dec. ¶ 17.

37. As noted earlier, John Marsh and Carol Marsh had executed a mortgage on the Residential Property to secure a $40,000.00 line of credit. Exhibit 8; J. Marsh Dec. ¶ 16. The credit line had an outstanding balance of $39,868.98 as of April 25, 2000, and the mortgage on the Residential Property continues to secure payment of the loan. J. Marsh Dec. ¶ 16, Exhibit 9. The credit line is still in John Marsh's name, and he alone makes payments of amounts due under the credit line. *Id.* John Marsh continued to take many substantial advances on the credit line after title to the Residential Property was transferred to the Marsh Trust. *Id.*

38. John Marsh said that the Marsh Trust has not filed state or federal tax returns. J. Marsh Dec. ¶ 22. Sean Marsh and Heather Manuel do not know whether the Marsh Trust has ever filed state or federal tax returns. S. Marsh Dec. ¶ 9; H. Manuel Dec. ¶ 10.

39. Sean Marsh admits that he has had no involvement with the operation of the Marsh Trust since it was formed. S. Marsh Dec. ¶ 3.

40. Sean Marsh believes that he and Heather Manuel are trustees of the Marsh Trust along with any children that either of them may have. S. Marsh Dec. ¶ 5. The trust instrument provides only for Sean and Heather to be the initial trustees and to appoint successor trustees. Exhibit 1. Although Heather Manuel is generally familiar with the duties of a trustee of a trust, she did not know that she and Sean Marsh were the trustees of the Marsh Trust until her deposition was taken in this case. H. Manuel Dec. ¶ 5.

41. Prior to their depositions in this case, Sean Marsh and Heather Manuel had not seen the Declaration of Trust. S. Marsh Dec. ¶ 10; H. Manuel Dec. ¶ 11.

42. Sean Marsh and Heather Manuel do not know whether there is a deed transferring title to the Residential Property to the Marsh Trust. S. Marsh Dec. ¶ 11; H. Manuel Dec. ¶ 12.

43. Sean Marsh and Heather Manuel do not know whether the Marsh Trust paid any consideration to John Marsh for the transfer of the Residential Property to it. S. Marsh Dec. ¶ 12; H. Manuel Dec. ¶ 13.

44. Sean Marsh and Heather Manuel are not aware that there is a mortgage on the Residential Property. S. Marsh Dec. ¶ 13; H. Manuel Dec. ¶ 14.

45. Sean Marsh and Heather Manuel do not know whether there is a deed transferring title to the Vacant Lot to the Marsh Trust. S. Marsh Dec. ¶ 15; H. Manuel Dec. ¶ 15.

46. Sean Marsh does not know whether the Marsh Trust paid any consideration to Marsh for the transfer of the Vacant Lot to it. S. Marsh Dec. ¶ 16.

47. Sean Marsh and Heather Manuel do not know whether the Marsh Trust has any bank accounts. S. Marsh Dec. ¶ 17; H. Manuel Dec. ¶ 15.

48. Sean Marsh and Heather Manuel do not know whether there have ever been meetings of the trustees of the Marsh Trust. S. Marsh Dec. ¶ 18; H. Manuel Dec. ¶ 15.

49. Sean Marsh and Heather Manuel do not know whether there are any creditors of the Marsh Trust. S. Marsh Dec. ¶ 17; H. Manuel Dec. ¶ 15.

50. Sean Marsh and Heather Manuel said they were not aware that the Marsh Trust had ever held title to the San Diego Property. S. Marsh Dec. ¶ 19; H. Manuel Dec. ¶ 16. However, Heather contradicted her statement on this subject when she testified that she understood fully the effect of her signing the "quitclaim deed" in August 1999 by which the Marsh Trust transferred the San Diego Property to Pingree.

51. Sean Marsh has never paid any expenses expressly on behalf of the Marsh Trust. S. Marsh Dec. ¶ 6. Heather Manuel also said she has not made any payments or distributed any property expressly on behalf of the Marsh Trust, *see* H. Manuel Dec. ¶ 7, although again she contradicted her own statement on this subject when at trial she acknowledged that she had knowingly signed the "quitclaim deed" conveying the San Diego Property from the Marsh Trust to Pingree. Testimony of Heather Manuel.

52. Sean Marsh and Heather Manuel do not know when the Marsh Trust will terminate. S. Marsh Dec. ¶ 9; H. Manuel Dec. ¶ 9. Heather Manuel does not know under what circumstances, if any, she or Sean Marsh could be entitled to ownership of the properties held by the Trust. H. Manuel Dec. ¶ 8.

## CONCLUSIONS OF LAW

1. At issue is whether the United States can foreclose its tax liens against the Residential Property and the Vacant Lot under either of three theories: 1) that the Marsh Trust holds title to the real properties as the nominee of John Marsh, 2) that John Marsh fraudulently conveyed the real properties to the Marsh Trust, or 3) that the Marsh Trust is a sham.

2. Section 6321 of Title 26 of the United States Code states:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in

favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

3. Under section 6321, the government may impose a lien on property in the hands of a nominee or alter ego of the taxpayer. *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–351, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). Federal tax liens against a taxpayer may be foreclosed against property held by a nominee or alter ego so long as the taxpayer is the equitable owner of the property. In such instances, the courts, including the Ninth Circuit, have ignored the fact that the property is in a third party's name, such as a trust, and upheld the United States' right to enforce its tax liens against such property. *See id.; LiButti v. United States,* 107 F.3d 110, 119 (2d Cir.1997); *Wolfe v. United States,* 798 F.2d 1241, 1245 (9th Cir. 1986) (finding that "a corporation will be disregarded where it is used to evade a public duty, such as the paying of taxes"); *Towe Antique Ford Foundation v. IRS,* 999 F.2d 1387, 1390 (9th Cir.1993); *Horton Dairy, Inc. v. United States,* 986 F.2d 286, 290–91 (8th Cir.1993) (finding that the IRS was authorized to levy against the property held in the name of HDI because HDI was the alter ego of the Hortons); *Shades Ridge Holding Co., Inc. v. United States,* 888 F.2d 725, 728–29 (11th Cir.1989) ("Property of the nominee or alter ego of a taxpayer is subject to the collection of the taxpayer's tax liability"); *F.P.P. Enterprises and D & S Trust v. United States,* 830 F.2d 114, 118 (8th Cir. 1987) ("Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer"); *Loving Saviour Church v. United States,* 728 F.2d 1085 (8th Cir.1984). *See also Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transportation Co., Inc.,* 91 Hawai'i 224, 982 P.2d 853 (1999) (recognizing application of alter ego theory under Hawaii law "where recognition of the corporate fiction would bring about injustice and inequity or when there is evidence that the corporate fiction has been used to perpetuate a fraud or defeat a rightful claim").

4. Courts have recognized that the nominee/alter ego theory applies not just to corporations, but also to trusts. *See, e.g., United States v. Landsberger,* No. 94–0883–PHX–SMM, 1997 WL 792506 (D.Ariz. Sept.30, 1997), *aff'd,* 172 F.3d 60, 1999 WL 71370 (9th Cir.1999). *See also F.P.P. Enterprises,* 830 F.2d at 118.

5. Factors considered in determining whether property is held by a nominee of the taxpayer include: (1) whether the taxpayer treats the property as if it belongs to him; (2) whether consideration was paid for the property; (3) whether the taxpayer expressed the intent to shelter the asset via the trust mechanisms; (4) whether the taxpayer maintained active or substantial control over the operations and decisions of the property; and (5) whether a family or close relationship exists between the taxpayer and the holding entity/trustees. *See Landsberger* at *6.

6. All five factors favor the court's finding that the Marsh Trust holds the Residential Property and the Vacant Lot as the nominee of John Marsh.

7. With respect to the first factor (whether the taxpayer treats the property as if it belongs to him), John Marsh has treated the Residential Property and the Vacant Lot as if they belong to him. John Marsh continues to take substantial advances on a line of credit secured by the Residential Property without the approval or knowledge of either trustee. John Marsh continues to come and go as he pleases from the Residential Property. According to John Marsh, the Residential Property "was his home as long as he wanted it to be" and he was

always welcome. He never had to ask permission. He controlled information on the ownership of both the Residential Property and the Vacant Lot, not even telling his children that they were trustees or that the trust had been formed.

8. The second factor concerns whether consideration was paid for the property. No consideration was paid to John Marsh for the transfer of the Residential Property or the Vacant Lot to the Marsh Trust.

9. The third factor concerns the taxpayer's expressed intent to shelter assets via the trust mechanisms. John Marsh expressed an intent to shelter the properties via the trust mechanisms. In accordance with a deathbed promise to his wife, John Marsh transferred the Residential Property and the Vacant Lot to the Marsh Trust to ensure that his children would receive those properties. At the time of the transfer, John Marsh was under criminal indictment and knew that he was being investigated for tax liability. John Marsh suggested to his attorney, Hayden Burgess, that a trust would be the best vehicle to "preserve" his assets. Before the trust was created, John Marsh had told Burgess that the IRS was asserting that he owed unpaid taxes.

10. The fourth factor concerns the taxpayer's control over the operations and decisions of the property. Marsh maintained active or substantial control over decisions relating to the properties held by the Marsh Trust. While Sean Marsh and Heather Manuel made decisions to maintain and repair the Residential Property, major decisions such as the transfer of property were made by John Marsh. John Marsh never even disclosed to his children that the trust declaration purported to give them control of the Residential Property and the Vacant Lot. It was John Marsh's decision to transfer the San Diego Property to Pingree to pay legal fees.[2]

11. The fifth factor concerns the relationship between the taxpayer and the trustees. A family or close relationship exists between Marsh and the trustees/beneficiaries of the Marsh Trust. The trustees and beneficiaries of the Marsh Trust are John Marsh's two children, Sean Marsh and Heather Manuel.

12. Other indicia establish that the trust entity is a fiction. Although named as trustees, neither Sean Marsh nor Heather Manuel knew about the existence of the San Diego Property. Sean Marsh and Heather Manuel appear to have little, if any, knowledge about the operations of the Marsh Trust. Heather Manuel did not know that she and Sean Marsh were the trustees of the Marsh Trust until some time after the Marsh Trust was formed. Before their depositions in this case, Sean Marsh and Heather Manuel had not seen the Trust Declaration. Sean Marsh and Heather Manuel did not know whether the Marsh Trust paid any consideration to Marsh for the transfer of the Residential Property to it. Sean Marsh and Heather Manuel were not aware that there was a mortgage on the Residential Property. Sean Marsh and Heather Manuel did not know when the Marsh Trust would terminate. Heather Manuel did not know under what circumstances, if any, she or Sean Marsh could be entitled to ownership of the properties held by the Trust.

13. In addition, the Marsh Trust has not filed state or federal tax returns and has not observed any trust formalities such as holding meetings of trustees. The Marsh Trust has no bank accounts or other assets with

2. Whether John Marsh decided that the San Diego Property should be transferred to Pingree to benefit John Marsh alone (as opposed to John Marsh, Sean Marsh, and Heather Manuel) is unclear.

which to pay expenses, and there is no evidence that anyone ever paid any rent to the Marsh Trust for use of the Residential Property.

14. Consequently, the court finds that the Marsh Trust holds title to the Residential Property and the Vacant Lot as the nominee of John Marsh.

15. With respect to the Residential Property and the Vacant Lot, the Marsh Trust is, in effect, John Marsh. His desires govern the decisions of the Marsh Trust insofar as both properties are concerned. The trustees, in fact, had little or no knowledge of the trust functions and their rights and responsibilities prior to this lawsuit. The court finds that "there is such a unity of interest ... that the individuality, or separateness, of [Marsh] and [the Marsh Trust] has ceased" with respect to both properties. *See Robert's Hawaii School Bus, Inc.*, 982 P.2d at 871.

16. The court similarly finds that "the facts are such that an adherence to the fiction of the separate existence of the [trust] would, under the particular circumstances, ... promote injustice" in connection with both properties. *See id.* Undisputedly, John Marsh transferred the Residential Property and the Vacant Lot to the Marsh Trust to ensure that his children received them. John Marsh had not met his tax obligations at the time of the transfer. But for the transfer, the properties would have been subject to IRS action to satisfy those obligations. The court cannot sanction such a transfer.

17. Because the court finds by a preponderance of the evidence that the Marsh Trust holds title to the Residential Property and the Vacant Lot as the nominee of John Marsh, the court need not reach the other two theories upon which the United States claims it may foreclose its tax liens.[3]

18. The government's claim that John Marsh fraudulently conveyed two properties was subject to proof by clear and convincing evidence. The court notes that, while the government has not shown by clear an convincing evidence that John Marsh transferred the Residential Property and the Vacant Lot to hinder, delay, or defraud the IRS, certain evidence does point toward that conclusion.

19. Before Carol Marsh's death, both the Residential Property and the Vacant Lot were held in tenancy by the entirety. Property held in tenancy by the entirety is not reachable by creditors of either spouse. When Carol Marsh died, the Residential Property and the Vacant Lot became available to John Marsh's creditors.

20. To keep his promise to Carol Marsh to preserve those properties for their children, John Marsh transferred his interest in those properties to his children.

21. The close proximity in time between Carol Marsh's death and the creation of the trust, and Hayden Burgess' testimony that John Marsh created the trust to "preserve" his assets, suggests that John Marsh created the Marsh Trust to shelter his real property from the IRS at a time when he was under federal criminal indictment for tax evasion.

22. John Marsh and Carol Marsh could have gifted their properties to their children long before Carol Marsh's death. John Marsh was a police officer who was well aware that he might die in service and Carol Marsh had been diagnosed with cancer a year before. Alternatively, if John Marsh's concern after Carol Marsh's death was that his subsequent wife not obtain the properties, he could have waited to transfer the properties until just before any remarriage.

---

**3.** Even if the applicable standard of proof were clear and convincing evidence, the court would reach the same conclusion (i.e., that the Marsh Trust holds title to the two properties as John Marsh's nominee).

## ORDER

It is hereby **ORDERED** and **AD-JUDGED** that the federal tax liens of the United States be foreclosed upon the Residential Property and Vacant Lot described in paragraphs 10 and 11 of the Complaint, that the properties be sold by a court-appointed Commissioner at a judicial sale, that the proceeds thereof be first applied to the costs of such sale, and that the balance of such proceeds of sale be distributed to the United States and the Bank of Hawaii according to the relative priorities to be determined by the court. The United States is ordered to submit, no later than September 8, 2000, a proposed foreclosure decree together with the names of three persons proposed as Commissioner.

IT IS SO ORDERED.