In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-2500
IN RE: JELENA DORDEVIC,
 Debtor,
 ____________________
GUS A. PALOIAN, as Trustee
 Plaintiff-Appellee,

 v.

JORGOVANKA DORDEVIC,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:21-cv-05328 — Gary Feinerman, Judge.
 ____________________

 ARGUED JANUARY 19, 2023 — DECIDED APRIL 27, 2023
 ____________________

 Before BRENNAN, SCUDDER, and KIRSCH, Circuit Judges.
 BRENNAN, Circuit Judge. Jelena Dordevic ﬁled for Chapter
7 bankruptcy. The Trustee then sued her mother, Jorgovanka
Dordevic, to recover a stake in a company registered in
2 No. 22-2500

Jorgovanka’s name, 1 a procedure called a “turnover.” The
Trustee successfully argued before the bankruptcy court that
Jorgovanka served as Jelena’s nominee—a party who holds
title for another’s beneﬁt. So, the court ruled that equitable
ownership of the stake in the company belonged to Jelena,
and thus that the property was subject to turnover to the
bankruptcy estate.
 Jorgovanka argues the bankruptcy court incorrectly ap-
plied a preponderance of the evidence standard of proof, ra-
ther than clear and convincing evidence, when making this
decision. But a preponderance standard applies unless partic-
ularly important individual interests are involved or the es-
tate’s theory for property turnover imposes a higher standard
of proof. Neither situation exists here, so the bankruptcy court
applied the correct standard of proof. Under that standard,
the bankruptcy court did not clearly err in ﬁnding that the
Trustee had met his burden of establishing Jelena’s equitable
ownership, and the district court correctly aﬃrmed the bank-
ruptcy court’s judgment for the Trustee.
 The Trustee also argues that Jorgovanka’s appeal is frivo-
lous and requests sanctions. Because Jorgovanka presented a
colorable legal argument on the standard of proof, we deny
that request.
 I. Background
 This appeal concerns an adversarial proceeding arising
out of the Chapter 7 bankruptcy of debtor Jelena Dordevic.
Under 11 U.S.C. § 542, the Trustee of Jelena’s estate sued
Jelena’s mother, Jorgovanka, for turnover of Jorgovanka’s

 1 We refer to certain parties by their first names for ease of reference.
No. 22-2500 3

50% record interest in PHMX LLC, a Florida company orga-
nized to produce injectable pharmaceuticals.
 Jorgovanka is the uncontested legal owner of the 50% in-
terest in PHMX at issue. The other half of the company is
owned by a third party, Shogher Zargaryan. The parties here
dispute who has equitable ownership of the 50% PHMX in-
terest registered in Jorgovanka’s name. To obtain the PHMX
stake for the sale and distribution of proceeds to Jelena’s cred-
itors, the Trustee had to prove that the PHMX stake is a part
of Jelena’s estate. 11 U.S.C. § 541. The Trustee sought to do so
on a theory that Jorgovanka is Jelena’s nominee—a “party
who holds bare legal title for the beneﬁt of others” 2—thus
vesting equitable ownership in Jelena. On appeal, Jorgovanka
claims equitable ownership under various theories, as does
Nikola Zaric, Jelena’s former business and romantic partner.
 The following facts were adduced at the bankruptcy trial.
Zaric and Jelena cofounded a trucking company in 2009 called
Arrow Freight, Inc. and were equal business partners. In 2015,
Zaric sold Jelena his half for $800,000 under the Arrow Freight
Stock Sale and Purchase Agreement. The two-page Agree-
ment says nothing about the timing of payment or a debt, and
though at trial Zaric referenced a note generated by the sale,
that note is not in the record. Per Zaric, he did not need the
money at the time and so did not demand payment immedi-
ately.
 Separately, around 2015 and 2016, medical researcher
Shogher Zargaryan designed specialized machinery to pro-
duce syringes with the intent to form a medical equipment
manufacturer. This technology served as the foundation of

 2 Nominee, BLACK’S LAW DICTIONARY (11th ed. 2019).
4 No. 22-2500

PHMX LLC. Shogher and others later formed a separate com-
pany, Pharmix USA LLC, to serve as a general contractor to
build the PHMX pharmaceutical factory. This entire project is
called the PHMX Project. Shogher eventually brought her son
and engineer, Nick Kazumian, and his now ex-wife, Kari
Kazumian, into the Project. Together they sought an investor.
 In late 2016 or early 2017, Zaric and Jelena, who at the time
were in a romantic relationship, met then-couple Nick and
Kari on a cruise. The couples became friendly, and Nick and
Kari pitched the PHMX Project to Zaric and Jelena. Zaric re-
counted that Nick approached him about the Project and that
they “decided to be 50/50 partners.” Zaric further averred that
Jelena was oﬀered a role in the PHMX investment oppor-
tunity but turned it down.
 But Nick, Kari, and Shogher testiﬁed to the contrary. Nick
and Kari indicated the three of them intended to bring in
Jelena—not Zaric—as the ﬁnancial partner for the PHMX Pro-
ject. And Shogher testiﬁed that she was looking for investors
in 2016 and 2017, and was introduced to Jelena by Nick and
Kari. Nick, Kari, and Shogher said it was understood that Jor-
govanka was inserted as nominal owner on behalf of Jelena.
Jelena attested this was done to avoid problems with immi-
gration authorities because she had been charged with immi-
gration fraud for trying to attain permanent residency in the
United States through an alleged sham marriage. But Zaric
said he—not Jelena—had requested Jorgovanka to be regis-
tered as the legal owner of the 50% stake in PHMX.
 Eventually, the PHMX factory construction began in Flor-
ida. The costs for the PHMX Project were covered by a
$1,000,000 construction loan and $773,250 of wire transfers
from Jelena’s personal bank account and the business
No. 22-2500 5

accounts of Arrow Freight, GTR, and Spirit Freight, which she
controlled.3 Relevant here is who has equitable ownership of
the company stake paid for by the $773,250 in wire transfers.
Jorgovanka and Zaric presented a variety of theories to show
equitable ownership of the PHMX stake belonged to them.
We brieﬂy summarize their supporting evidence.
 Recall that Jelena allegedly owed Zaric money from the
Arrow Freight stock sale—money that Zaric said he had not
immediately demanded. Jelena and Zaric testiﬁed that the
wire transfers were made at Zaric's direction for repayment
of that alleged debt. But Shogher, Kari, and Nick testiﬁed to
the contrary. They all recalled conversations with Jelena that
indicated she had initiated the wire transfers on her own, not
on Zaric’s instructions. And contemporaneous emails and
text messages showed that Jelena was inquiring into and dis-
bursing funds for Pharmix’s mortgage, environmental ex-
penses, construction expenses, and even porta potties for the
construction site.
 At trial, Jorgovanka produced a Nominee Agreement that
by its terms suggested Jorgovanka held the PHMX stake for
Zaric’s beneﬁt. She also proﬀered a Secured Promissory Note
for $500,000 lent by Zaric to Jorgovanka for alleged invest-
ment into PHMX, which suggested that Jorgovanka was to be
owner of the interest. Zaric testiﬁed inconsistently that he or
Jorgovanka was to be the equitable owner of the 50% PHMX
stake under these documents. Jorgovanka also claimed that
she made a separate $112,000 contribution to the PHMX Pro-
ject for her own interest. But Zaric testiﬁed that the $112,000
was for a purpose diﬀerent from the Project. He said he

 3 GTR and Spirit Freight were other trucking businesses Jelena owned.
6 No. 22-2500

transferred that amount to Jorgovanka with the understand-
ing that Jorgovanka’s son would simultaneously transfer the
money in cash to Zaric’s father in Serbia for house renova-
tions. The positions of Zaric and Jorgovanka were convoluted,
and the testimony of Jorgovanka’s witnesses—Zaric, herself,
and Jelena—often conﬂicted.
 After a three-day trial, the bankruptcy court decided that
the Trustee had established by a preponderance of the evi-
dence that Jelena was the equitable owner of the PHMX inter-
est. Jorgovanka appealed to the district court, which aﬃrmed
the bankruptcy court. Jorgovanka then appealed to this court.
While awaiting oral argument, the Trustee moved for sanc-
tions under Federal Rule of Appellate Procedure 38, arguing
that this appeal is frivolous.
 II. Standard of Proof
 Jorgovanka ﬁrst asserts that the correct standard of proof
for turnover of property under 11 U.S.C. § 542 is the height-
ened clear and convincing evidence standard, rather than the
preponderance standard that the bankruptcy court applied.
We review legal questions de novo. In re USA Gymnastics, 40
F.4th 775, 777 (7th Cir. 2022). To evaluate Jorgovanka’s asser-
tion, we begin by discussing the turnover procedure under
the Bankruptcy Code and its predecessor statute.
 A. Section 542
 Under Bankruptcy Code Section 542, a trustee assigned to
administer a debtor’s estate may recover property of the es-
tate from third parties via a “turnover.” 11 U.S.C. § 542. Prop-
erty of the bankruptcy estate includes “all legal and equitable
interests of the debtor in property as of the commencement of
the case.” 11 U.S.C. § 541(a)(1). What constitutes property of
No. 22-2500 7

the estate under Section 541 is a question of federal law, but
state law often determines whether a debtor has an interest in
property. See Barnhill v. Johnson, 503 U.S. 393, 398 (1992) (cita-
tions omitted) (“In the absence of any controlling federal law,
‘property’ and ‘interests in property’ are creatures of state
law.”); Butner v. United States, 440 U.S. 48, 54–55 (1979) (“Con-
gress has generally left the determination of property rights
in the assets of a bankrupt’s estate to state law.”); In re Thorpe,
881 F.3d 536, 539 (7th Cir. 2018) (citation omitted); Fisher v.
Apostolou, 155 F.3d 876, 880 (7th Cir. 1998) (citation omitted).
So, a variety of legal theories can support what constitutes
property of an estate under Section 541, and thus what is sub-
ject to turnover under Section 542.
 1. Bankruptcy Act of 1898
 The federal bankruptcy statutory regime was revamped in
1978 by the Bankruptcy Reform Act (eﬀective October 1,
1979), which replaced the prior Bankruptcy Act of 1898 with
the Bankruptcy Code. Bankruptcy Reform Act, Pub. L. 95–
598, 92 Stat. 2549 (November 6, 1978) (codiﬁed as amended at
11 U.S.C. ch. 1, et seq.). Since that reform, there has been some
confusion about the proper standard for bankruptcy turno-
vers, a procedure that existed under the Bankruptcy Act
framework. In re Meyers, 616 F.3d 626, 630 (7th Cir. 2010). Nei-
ther the Supreme Court nor this court has resolved this ques-
tion.
 This court adopted the preexisting burden-shifting
scheme for turnover actions in In re Meyers: A trustee ﬁrst
“bears the burden of establishing a prima facie case for turn-
over,” then “the debtor must provide a reason for going for-
ward with the case.” Id. at 629–30 (citations omitted). “[B]ut
the ultimate burden of persuasion remains with the trustee at
8 No. 22-2500

all times.” Id. In Meyers, this court also suggested—in dicta
that the bankruptcy court relied upon—that “we think that
the default preponderance standard that the Supreme Court
applied to dischargeability in Grogan is probably the appro-
priate one also for turnover actions” Id. at 630 (citing Grogan
v. Garner, 498 U.S. 279 (1991)). But that case did not resolve
this question, because the result would have been the same
under either standard. Id.
 Jorgovanka criticizes the bankruptcy court’s reliance on
the Meyers dicta in applying a preponderance standard. She
argues that the clear and convincing standard for summary
turnovers under the Bankruptcy Act controls, based on Mag-
gio v. Zeitz, 333 U.S. 56, 64 (1948) and Oriel v. Russell, 278 U.S.
358, 362–63 (1929). This court last applied the clear and con-
vincing standard for a turnover in Gorenz v. Ill. Dep’t of Agric.,
653 F.2d 1179, 1184 (7th Cir. 1981). True, these three cases all
held that “[a]s part of his prima facie case, the trustee must
demonstrate through clear and convincing evidence that the
property or proceeds in question are a part of the bankrupt’s
estate.” Gorenz, 653 F.2d at 1184 (citing Maggio, 333 U.S. at 64);
see Oriel, 278 U.S. at 362–63. But each decision was based on
the judicially created summary turnover procedure that ex-
isted under the now-defunct Bankruptcy Act. 4 Maggio, 333
U.S. at 61–64. The summary turnover procedure was created
to eﬀectuate the Bankruptcy Act, which imposed criminal
sanctions—including “heavy penalties of ﬁne or

 4 Gorenz, though decided by our court in 1981, involved a petition for

bankruptcy filed January 23, 1978. 653 F.2d at 1181. So, the petition in that
case was filed before the Bankruptcy Reform Act became effective on Oc-
tober 1, 1979. Contrary to Jorgovanka’s suggestions, Gorenz still operated
under the Bankruptcy Act.
No. 22-2500 9

imprisonment or both”—for a “comprehensive list of frauds,
concealments, falsiﬁcations, mutilation of records and other
acts that would defeat or obstruct collection of the assets of
the estate.” Id. at 61–62 (citing 11 U.S.C. §§ 11(a)(4), 52(b), 42(c)
(1946)); see Bankruptcy Act, ch. 541, §§ 1(22), 2(4), (13)–(16), 29
(1898). Such oﬀenses were subject to investigation and prose-
cution by the United States Attorney, in cooperation with the
bankruptcy referee. Maggio, 333 U.S. at 62 (citing 11 U.S.C.
§ 52(e) (1946)); see Bankruptcy Act, ch. 541, § 29(d) (1898).
 The courts fashioned the summary turnover procedure
“to retrieve concealed and diverted assets … the withholding
of which … would intolerably obstruct and delay administra-
tion.” Maggio, 333 U.S. at 62–63. Given the background of
criminal sanctions, the courts imposed a stringent clear and
convincing evidence standard, like the one imposed in a case
of fraud in a court of equity. Id. at 62–64; Oriel, 278 U.S. at
362-63.
 2. Bankruptcy Code
 Fast forward to the Bankruptcy Code, which no longer in-
cludes criminal sanctions. See 11 U.S.C. ch. 1, et seq. Granted,
many criminal actions related to bankruptcy are codiﬁed in
18 U.S.C. ch. 9, including concealment of assets, embezzle-
ment against the estate, and bankruptcy fraud. 18 U.S.C
§§ 152, 153, 157. Still, the federal bankruptcy system changed
after the Bankruptcy Code became eﬀective in 1979, as recog-
nized in Grogan v. Garner, 498 U.S. 279 (1991). Although
Grogan concerned the non-dischargeability of debt for actual
fraud under 11 U.S.C. § 523(a)(2)(A), 498 U.S. at 280–81, the
Supreme Court’s reasoning applies just as well to turnovers
under Sections 542 and 541.
10 No. 22-2500

 Grogan established that, in the absence of an express or
implied standard of proof in the Bankruptcy Code, the pre-
sumptive standard of proof under its provisions is the pre-
ponderance standard governing civil actions generally. Id.
(“[W]e presume that this standard is applicable in civil actions
between private litigants.”). This standard governs unless
“particularly important individual interests or rights are at
stake.” Id. (quoting Herman & MacLean v. Huddleston, 459 U.S.
375, 389–90 (1983)). In holding that the preponderance stand-
ard governed, the Court thought it unlikely that Congress
would have favored debtors’ interest in having a fresh start
following bankruptcy over the interests of victims of fraud. Id.
at 286–87.
 As in Grogan, Sections 541 and 542 do not prescribe a
standard of proof. See 11 U.S.C. §§ 541, 542. The predecessor
summary turnover procedure was a judicial creation, Maggio,
333 U.S. at 61–64, so at best it provides only guidance as to the
new statutory framework. And the backdrop of criminal sanc-
tions under the defunct Bankruptcy Act that undergirded the
Supreme Court’s imposition of a higher standard no longer
exists in the Bankruptcy Code. As we see next, the relevant
individual interests Grogan instructed us to consider lead us
to a preponderance standard.
 B. Individual Interests
 Where Congress has not prescribed a standard of proof,
the Supreme Court will assign one. Huddleston, 459 U.S. at 389.
In establishing a standard of proof, the Court is “mindful that
a standard of proof ‘serves to allocate the risk of error between
the litigants and to indicate the relative importance attached
to the ultimate decision.’” Id. (quoting Addington v. Texas, 441
U.S. 418, 423 (1979)). Thus, the Court has “required proof by
No. 22-2500 11

clear and convincing evidence where particularly important
individual interests or rights,” such as individual liberty, “are
at stake.” Id. (citing Santosky v. Kramer, 455 U.S. 745 (1982)
(proceeding to terminate parental rights); Addington, 441 U.S.
418 (involuntary commitment proceeding); Woodby v. INS,
385 U.S. 276 (1966) (deportation proceeding)).
 Here, no particularly important individual interests or
rights are at stake. “This case is solely about money”—that is,
who has equitable title to the PHMX stake and proceeds from
its sale. In re Briscoe Enters., Ltd., II, 994 F.2d 1160, 1165 (5th
Cir. 1993). “There are not … any quasi-liberty interests at
stake.” Id. In such cases, our sister circuits have held that a
preponderance standard applies to diﬀerent Bankruptcy
Code provisions. In re Johnson, 501 F.3d 1163, 1169–70 (10th
Cir. 2007) (willful violation of an automatic stay under 11
U.S.C. § 362(k)(1)); In re Norris, 1997 WL 256808, at *3–4 (5th
Cir. Apr. 11, 1997) (question of debtor not paying debts as
they become due unless such debts are the subject of a bona
ﬁde dispute under 11 U.S.C. § 303(b)(1), (h)(1)); In re Briscoe
Enters., 994 F.2d at 1163–65 (Chapter 11 reorganization plan
conﬁrmation under 11 U.S.C. § 1129(b)).
 The conﬂict here is among third parties—the alleged nom-
inee (Jorgovanka), Zaric, and creditors. There is no evident
statutory preference for the creditors’ or another third party’s
interests to trump that of the nominee titleholder or vice
versa. Without statutory direction to favor one interest over
another, the default preponderance of evidence standard gov-
erns for Section 542 turnovers unless the estate’s theory for
property turnover prescribes a heightened standard. We dis-
cuss this next.
12 No. 22-2500

 C. Kelley and the Estate’s Theory for Property Turnover
 The Trustee cites Kelley v. Stevanovich, 40 F.4th 779 (7th Cir.
2022), as adopting a preponderance standard for Section 542
turnovers and rejecting the clear and convincing standard
from Maggio and Oriel. That is not quite correct. In Kelley, we
rejected the appellant’s reliance on Maggio and Oriel as unper-
suasive because the cases “considered an outdated procedure
superseded by the Bankruptcy Code,” but we did not address
turnovers under Sections 542 and 541. Id. at 788–89. As Jorgo-
vanka correctly notes, Kelley concerned a post-judgment dis-
trict court proceeding in which the trustee sought turnover of
property under an Illinois state law theory of embezzle-
ment—not Sections 542 and 541. Id. at 783–84. So while in
Kelley this court applied a preponderance standard for the
turnover in question, we did so primarily “[b]ecause the Illi-
nois statute does not provide a higher standard of proof for
recovery.” Id. at 789.
 Under the rationale of Grogan and Kelley, courts should ap-
ply the preponderance standard to bankruptcy turnovers by
default unless Congress indicates that “particularly im-
portant individual interests or rights are at stake” or the rele-
vant law for the estate’s theory for property turnover imposes
a higher standard of proof. Grogan, 498 U.S. at 286 (quoting
Huddleston, 459 U.S. at 389–90); Kelley, 40 F.4th at 788–89. Con-
gress did not express a policy that a nominee titleholder’s in-
terest overcomes a creditor’s or another third party’s interest.
With congressional silence on the issue, we presume the rele-
vant interests are in parity. But a question remains as to
whether the estate’s nominee theory for turnover requires a
higher standard of proof than preponderance.
No. 22-2500 13

 Applying federal law, 5 courts have uniformly held—albeit
in diﬀerent contexts—that a preponderance standard applies
in determining nomineeship. 6 Given this authority, we hold
that a preponderance standard applies here. In recent cases,
courts have applied a preponderance standard for turnovers
under Section 542. E.g., In re Miller, 741 F. App’x 859, 862 (3d
Cir. 2018); In re Jacobson, 676 F.3d 1193, 1200–01 (9th Cir. 2012)
(applying a preponderance standard but not deciding the is-
sue conclusively); In re Bruner, 561 B.R. 397, 403 (B.A.P. 6th
Cir. 2017); In re Crowson, 431 B.R. 484, 489 (B.A.P. 10th Cir.
2010); see also 5 COLLIER ON BANKRUPTCY ¶ 542.03 (Richard
Levin & Henry J. Sommer eds., 16th ed. 2023). The same is
true of recent bankruptcy court cases within and outside our
circuit. 7
 All these cases are more recent than the Eighth Circuit and
bankruptcy court cases Jorgovanka cites in support of a clear

 5 The parties do not contest the bankruptcy court’s decision that be-

cause PHMX, Inc. was organized in Florida, that state’s law applies in de-
termining the equitable ownership of the stake in that company. Because
Florida law does not prescribe a test for determining equitable title under
a nominee theory, the bankruptcy court applied a federal common law
factor test to determine the issue. Neither party objected to this choice of
law, and we do not diverge from it.
 6 See, e.g., United States v. One 1990 Beechcraft, 1900 C Twin Engine

Turbo-Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118, 619
F.3d 1275, 1277 (11th Cir. 2010); LiButti v. United States, 107 F.3d 110, 119-20
(2d Cir. 1997); United States v. Reed, 168 F. Supp. 2d 1266, 1268–69 n.1 (D.
Ut. 2001); United States v. Marsh, 114 F. Supp. 2d 1036, 1045 (D. Haw. 2000).
 7 E.g., In re FDV Artfolio LLC, 618 B.R. 29, 34 (Bankr. W.D. Okla. 2020);

In re Pac. Thomas Corp., 603 B.R. 455, 461 (Bankr. N.D. Cal. 2019); In re Lee,
508 B.R. 399, 407 (Bankr. S.D. Ind. 2014); In re McCoy, 464 B.R. 832, 835
(Bankr. W.D. Wis. 2011).
14 No. 22-2500

and convincing standard. The Eighth Circuit in Evans relied
on Bankruptcy Act cases, Maggio and Gorenz, and was decided
before the Supreme Court’s 1991 clariﬁcation of the Bank-
ruptcy Code’s standard of proof in Grogan. Evans v. Robbins,
897 F.2d 966, 968 (8th Cir. 1990) (citing Maggio, 333 U.S. at 64
and Gorenz, 653 F.2d at 1184).
 * * *
 All indications point one way: The default preponderance
standard applies to the Trustee’s nominee theory for turnover
under Section 542. The bankruptcy court applied the correct
standard, so next we review the bankruptcy court’s ﬁnding
under that standard of Jelena’s equitable ownership.
 III. Equitable Ownership
 A bankruptcy court’s factual ﬁndings are reviewed for
clear error—“in other words, with a serious thumb on the
scale for the bankruptcy court.” U.S. Bank Nat. Ass’n ex rel.
CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC, 138 S. Ct.
960, 966 (2018) (citing FED. R. CIV. P. 52(a)(6)). Mixed questions
of law and fact that are primarily factual are also reviewed for
clear error. Id. at 966–69. As seen below, determining equita-
ble ownership is a mixed question that depends heavily on
factual ﬁndings. So, we review for clear error the bankruptcy
court’s determination that the Trustee established Jelena’s eq-
uitable ownership of the PHMX stake.
 Jorgovanka disputes this conclusion and asserts that de-
spite the uncontested evidence that Jelena wired $773,250 to
Pharmix, equitable ownership of PHMX belongs to her or to
Zaric. To decide whether Jorgovanka was a nominee for
Jelena, the bankruptcy court applied a ﬁve-factor test for nom-
ineeship from an unpublished Seventh Circuit opinion,
No. 22-2500 15

United States v. Szaﬂarski, 614 F. App’x 836, 838–39 (7th Cir.
2015): “(1) there is a close personal relationship between the
nominee and the transferor; (2) the nominee paid little or no
consideration for the property; (3) the parties placed the prop-
erty in the name of the nominee in anticipation of collection
activity; (4) the parties did not record the conveyance; and,
(5) the transferor continues to exercise dominion and control
over the property.” These factors generally accord with other
federal caselaw. See, e.g., Oxford Capital Corp. v. United States,
211 F.3d 280, 284 n.1 (5th Cir. 2000). We analyze the facts here
under these factors.
 On the ﬁrst factor, Jorgovanka is both Jelena’s mother and
dependent, which weighs in favor of Jelena’s equitable own-
ership. The bankruptcy court found the fourth factor—re-
cording of conveyance—irrelevant without stating why. This
was probably because Jorgovanka’s status as record
titleholder is uncontested. The relevant question is who had
equitable title to Pharmix despite record title belonging to Jor-
govanka. So, we need not address this fourth factor. We ex-
amine the remaining three factors next.
 A. Jorgovanka’s Consideration
 On the second Szaﬂarski factor, we review Jorgovanka’s
contributions as well as whether she is the real party in inter-
est.
 1. Contributions by Jorgovanka
 No evidence shows that Jorgovanka contributed ﬁnan-
cially to the PHMX Project. Jelena—not Jorgovanka—wired
$773,250 to PHMX’s general contractor, Pharmix. The Trustee
asserts that these funds were consideration for Jelena’s 50%
equitable interest in PHMX. While legal title was in
16 No. 22-2500

Jorgovanka’s name, there was no ﬁnancial record of transfers
by Jorgovanka for the PHMX Project. All the ﬁnancing for the
Project—apart from the $1 million construction loan—came
from $773,250 in wire transfers from accounts controlled by
Jelena.
 Jorgovanka asserts that she independently contributed
$112,000 to the PHMX Project for her own interest. In the al-
ternative, she claims this contribution should be attributed to
Zaric. As noted, no ﬁnancial record shows that Jorgovanka
contributed funds to the PHMX Project. Contradicting Jorgo-
vanka’s assertion, Zaric testiﬁed that because he wanted
$112,000 sent to his father to renovate Zaric’s house in Serbia,
he transferred the amount to Jorgovanka with the under-
standing that Jorgovanka would then instruct her son, Igor, to
take the money in cash to Zaric’s father in Serbia. This sug-
gests that the $112,000 had nothing to do with the Project.
Moreover, there is no ﬁnancial record of this sum being trans-
ferred from Zaric to Jorgovanka.
 Jorgovanka highlights that bank records reveal transfers
to Jelena from Zaric or companies he owned, totaling exactly
$112,000. The records do show that Zaric transferred to Jelena
$80,000, $10,000, and $22,000. But this misses the point. There
is no evidence of transfers by Zaric or Jorgovanka speciﬁcally
for the PHMX Project. And there is no documentation that the
transfers to Jelena were for Jorgovanka’s or Zaric’s alleged in-
terest in PHMX. The bankruptcy court thus did not clearly err
in rejecting the claims of Jorgovanka and Zaric based on the
$112,000.
 The record also fails to support any non-ﬁnancial contri-
butions by Jorgovanka to the PHMX Project. The PHMX Pro-
ject was the brainchild of Shogher Zargaryan as well as her
No. 22-2500 17

business partners Nick and Kari Kazumian—not Jorgovanka.
The bankruptcy court emphasized that Jorgovanka cannot
speak English and she has no expertise in pharmaceuticals,
factory construction, engineering, or any other skill that
would be useful in running an enterprise like PHMX. On ap-
peal, Jorgovanka portrays herself as a businesswoman and a
competent part-owner of a chain-restaurant in Serbia. Re-
gardless of her abilities, Jorgovanka has not identiﬁed any
speciﬁc acts of managerial or technical assistance by her for
the beneﬁt of the PHMX Project.
 PHMX co-founder, Shogher, testiﬁed she met Jorgovanka
only twice on social occasions. Shogher also said Jorgovanka
lacked knowledge of the business. So, the evidence shows that
Jorgovanka paid no consideration—ﬁnancial or otherwise—
for the 50% share of PHMX and that Jelena contributed all the
$773,250 in funding. This supports the Trustee’s theory of
Jelena’s equitable ownership.
 2. Jorgovanka—Not the True Party in Interest
 This second Szaﬂarski factor of whether “the nominee paid
little or no consideration for the property,” 614 F. App’x at
838–39, also assesses whether the nominee is not the true
party in interest and thus that equitable title is held by some-
one else.
 Jorgovanka advances three reasons for why she or Zaric is
the equitable owner: (1) the payments from Jelena to the
PHMX Project are repayments to Zaric for his sale of Arrow
Freight stock to Jelena; (2) Zaric made Jorgovanka a loan
pursuant to a Secured Promissory Note and Nominee Agree-
ment, allegedly making Jorgovanka his nominee; and (3) Jor-
govanka (or possibly Zaric) separately invested $112,000 into
18 No. 22-2500

the PHMX Project. We already discussed why the evidence
does not support the third, so we discuss the ﬁrst two.
 (i) Repayment for Arrow Freight Stock Sale
 Jorgovanka does not contest the bankruptcy court’s ﬁnd-
ing that no written documentation showed that Jelena’s wire
transfers were in repayment for a debt to Zaric generated by
the Arrow Freight stock sale. So, the question is whether the
transaction generated a debt owed by Jelena to Zaric and
whether that debt was partially repaid by Jelena via the
$773,250 in wire transfers. Evidence of that is lacking.
 For one, the Arrow Freight Stock Sale and Purchase Agree-
ment says the buyer (Jelena) agreed to pay Zaric $800,000 for
his interest in Arrow Freight. But the two-page Agreement
says nothing about when or how that amount would be paid
or whether a debt would be generated by the sale. At trial,
Zaric referenced a “note” from the sale but that note is no-
where in the record. Even if we accepted that the Agreement
was enough documentation for a debt, there is no documen-
tary evidence that Zaric assigned any right to repayment to
Pharmix and that such payments would be for his equitable
interest in PHMX. All we have are post hoc testimonies from
Zaric, Jelena, and Jorgovanka, all of whom the bankruptcy
court found not credible for, among other reasons, their “ﬁ-
nancial motivation to shade the truth.”
 Jelena testiﬁed that she believed she still owed some of the
$800,000 under the Arrow Freight Stock Sale and Purchase
Agreement. But incredibly, she said she never paid any of the
money directly to Zaric. Given that the plain language of the
Agreement says the buyer (Jelena) would pay the seller
(Zaric) $800,000 without qualiﬁcation, one would assume that
No. 22-2500 19

there would be some ﬁnancial record of payments and an ac-
counting for debt still owed and interest, if any. Instead,
Jelena testiﬁed she owed Zaric a debt for the sale, which the
bankruptcy court found was severely impeached by the fact
that Jelena deliberately omitted the alleged debt from her
bankruptcy schedules, despite attesting that the schedules
were correct and complete.
 Jelena’s credibility was further impugned by her testi-
mony at a Bankruptcy Rule 2004 examination by her secured
creditors. In her testimony, she could not account for the
whereabouts of her ﬂeet of over 100 trucks and trailers that
constituted the collateral of her creditors. The bankruptcy
court found that Jelena had “repeatedly demonstrated to the
Court her propensity for prevarication and evasion, even
when under oath, in an apparent attempt to place assets be-
yond the reach of her creditors.” Similarly, the court found
that Jorgovanka and Zaric’s ﬁnancial and personal ties to
Jelena, as well as their own ﬁnancial interests in the 50% stake
of PHMX, impaired their credibility. It also found that Zaric’s
conﬂicting testimony regarding the Nominee Agreement and
Secured Promissory Note (discussed below) and the incon-
sistency of his testimony with Jorgovanka’s regarding the
$112,000, among other things, further damaged Zaric’s credi-
bility. We review these credibility determinations with ut-
most deference to the trial court, which under Federal Rule of
Civil Procedure 52(a) “demand[] even greater deference to the
trial court’s ﬁndings.” Anderson v. Bessemer City, 470 U.S. 564,
575 (1985) (citation omitted) (“[O]nly the trial judge can be
aware of the variations in demeanor and tone of voice that
bear so heavily on the listener’s understanding of and belief
in what is said.”); Kadia v. Gonzales, 501 F.3d 817, 819 (7th Cir.
2007). These credibility ﬁndings stand.
20 No. 22-2500

 In the absence of documentation supporting the repay-
ment theory, the bankruptcy court found that “[t]he simplest
explanation for the wire transfers is that they were just what
they appear to be: payments directly to Pharmix by Debtor,
from Debtor, for Debtor.” We see no clear error in this ﬁnding.
 (ii) Promissory Note & Nominee Agreement
 Jorgovanka alternately contends that the Nominee Agree-
ment and Secured Promissory Note between her and Zaric
showed she was a nominee for Zaric, not for Jelena. On its
face, the document supports that Jorgovanka acted as nomi-
nee for Zaric as to “their combined interest in PHMX.”
Paragraph 2.a clariﬁes that the nominee will hold all the “des-
ignated portion of their right, title and interest in the PHMX
Shares.” And Paragraph 2.b says that the “Nominee otherwise
has their [sic] pro rata legal and beneﬁcial interest in the
PHMX Shares.” So, the Nominee Agreement appears to pro-
vide for both Jorgovanka’s nomineeship in support of Zaric’s
equitable ownership of 50% of PHMX, as well as Jorgovanka’s
independent pro rata ownership in PHMX—perhaps for her
alleged $112,000 contribution. Given that Shogher is the un-
contested 50% owner of PHMX, it is unclear from the four cor-
ners of the Agreement what Jorgovanka’s alleged share of the
business is, separate from Shogher’s and Zaric’s alleged 50/50
shares of the business.
 We agree with the bankruptcy court that the Nominee
Agreement supports Zaric’s testimony that he and Nick de-
cided they (but actually, Shogher and Zaric) would be “50/50
partners.” But Nick denied he had ever discussed being part-
ners with Zaric. Nick’s testimony that Jelena—not Zaric—was
to be a partner was “clear, internally consistent, and sup-
ported by contemporaneous documents, particularly the
No. 22-2500 21

documents memorializing the wire transfers from Debtor to
Pharmix.” To the contrary, Zaric’s testimony was internally
inconsistent, especially when he deviated and began to testify
that “Jorgovanka personally … took the money to invest as an
owner,” suggesting that she—not him—was both the legal
and equitable owner. Still, Zaric said, somehow, he was to re-
main as a “silent investor.”
 Supporting this alternate theory was the $500,000 Secured
Promissory Note. But Zaric admitted that he never took any
steps to collect on the note, and there were no signs of money
transfers between Zaric and Jorgovanka or between Jorgo-
vanka and the PHMX Project. All the wire transfers for the
Project came from Jelena—not Jorgovanka. For these reasons
and the others mentioned above, the bankruptcy court found
Nick’s testimony more credible than Zaric’s on the issue of
any ownership by Zaric, a judgment call that demands great
deference. Anderson, 470 U.S. at 575. The court thus rejected
Zaric’s assertion of equitable ownership. It made this credibil-
ity ﬁnding even though some of Zaric’s inconsistencies could
be explained by his shoddy cut-and-paste creation and mis-
understanding of some terms in the Nominee Agreement and
the Promissory Note. On this, we defer to the bankruptcy
court’s determination. Further, because there was no evidence
of money transfers between Zaric and Jorgovanka, Zaric’s al-
ternate contention that Jorgovanka was to be sole owner of
PHMX also fails.
 The bankruptcy court considered yet another explanation
on behalf of Zaric: that the Promissory Note evidenced a
loan—albeit three years after the Arrow Freight sale—from
Zaric to Jorgovanka (but really, Jelena) for the remainder of
the alleged $800,000 Arrow Freight debt. The Note is dated
22 No. 22-2500

March 1, 2018. This third alternative was supported by the fact
that, as of that date, Jelena had wired only $276,250 to Phar-
mix. The eventual total of wire transfers by Jelena to the
PHMX Project was $773,250, and deducting $276,250 yields
$497,000—suspiciously close to $500,000. Zaric therefore
could have reasonably estimated that the remainder of the
debt on the $800,000 Arrow Freight stock sale was about
$500,000 as of March 2018—especially if approximately
$26,750 of the debt was paid down earlier. This gives rise to
the reasonable inference that Zaric tried to retroactively use
the Promissory Note to document the 2015 Arrow Freight
stock sale debt three years after the transaction. This would
show that Jelena’s transfers to Pharmix were consideration for
the alleged Arrow Freight debt. At trial, though, Zaric
changed positions and testiﬁed the Note showed that Jorgo-
vanka was sole owner of the 50% stake in PHMX. Adding to
the confusion, Zaric simultaneously claimed the Nominee
Agreement showed that he was the equitable owner. It is no
wonder that the bankruptcy court did not credit Zaric and
said, “The Court is not buying it.” We do not either.
 In a last attempt to demonstrate that the PHMX interest
belonged to Zaric, Jorgovanka cites Zaric’s nonﬁnancial con-
tributions to the PHMX Project as if they were consideration
for his alleged 50% equitable ownership of PHMX. She points
to testimony about how Zaric was intimately involved in the
PHMX factory construction. But the bankruptcy court
observed that testimony regarding Zaric’s day-to-day in-
volvement was hotly contested by Shogher, Nick, and Kari—
despite contrary testimony by Jelena, Jorgovanka, and Zaric
himself. More importantly, Zaric’s alleged nonﬁnancial con-
tributions are irrelevant unless he can show that they consti-
tuted consideration for the 50% PHMX stake. That link is
No. 22-2500 23

missing. Even more, Zaric’s alleged day-to-day involvement
in the PHMX Project is contrasted with his testimony that he
was to remain a “silent investor.”
 In sum, the evidence showed that Jorgovanka paid no con-
sideration for the 50% share of PHMX and that Jelena is the
true party in interest. This second factor, whether evaluated
by the lack of Jorgovanka’s contributions or beneﬁcial inter-
est, weighs heavily in favor of Jelena’s equitable ownership,
not Jorgovanka’s.
 B. Intent to Avoid Collection Activity
 As to the third Szaﬂarski factor, the evidence showed that
Jelena placed the property in Jorgovanka’s name to avoid col-
lection activities by Jelena’s creditors. We discussed above
how Jelena—despite her $772,000 in transfers allegedly meant
to repay the Arrow Freight debt—deliberately omitted that
debt from her bankruptcy schedules. This was in spite of her
attestation that the schedules were correct and complete. She
also said in the Rule 2004 examination that she could not ac-
count for the whereabouts of her truck ﬂeet, which was her
creditors’ collateral. This evidence gives rise to the inference
that Jelena, despite funding the PHMX Project, placed legal
ownership in Jorgovanka’s name to avoid collection eﬀorts by
her creditors. The alternative theories of equitable ownership
by Zaric or Jorgovanka can reasonably be understood as paths
to keep the 50% stake in PHMX out of Jelena’s creditors’
reach.
 Jorgovanka states that Jelena’s immigration problems,
based on a former alleged sham marriage, supply a diﬀerent
rationale to identify Jorgovanka as nominee. It does not fol-
low why making Jorgovanka nominee would help Jelena with
24 No. 22-2500

alleged immigration issues, and the record does not clarify the
motive. Perhaps for that reason, the bankruptcy court found
more reasonable the explanation that “[Jelena’s] signiﬁcant
omissions of her debts and assets in her bankruptcy schedules
also support the conclusion that she placed Jorgovanka in the
position of nominee in order to shield her 50% membership
interest in PHMX from her creditors.” We ﬁnd no clear error
in this determination. This, too, weighs in favor of Jelena’s eq-
uitable ownership.
 C. Dominion and Control
 On the ﬁfth Szaﬂarski factor, Jelena’s involvement as an in-
vestor in PHMX demonstrates her dominion and control of
the stake in the company. Jorgovanka pushes back, contend-
ing the evidence showed only that Jelena was a “payment sta-
tion” for funding PHMX “in repayment of her debt to Zaric.”
But the bankruptcy court correctly rejected Jorgovanka’s con-
tention. And to the extent Jelena was not a manager of the
PHMX Project, Jorgovanka misapprehends the bankruptcy
court’s ﬁndings.
 The evidence showed that Shogher, Nick, and Kari were
seeking a ﬁnancial investor, rather than a technical or mana-
gerial expert, for the PHMX Project. Most, if not all, of the
brainpower and managerial expertise for the Project came
from Shogher, Nick, and Kari. The evidence that Jelena served
as a “working capital account” to fund various transactions of
PHMX is consistent with her being an active investor. The
strongest evidence of Jelena’s involvement in PHMX is her
$773,250 in transfers. As the bankruptcy court observed, any
additional involvement “is simply further evidence” of
Jelena’s position as an investor “as it evinces her interest in
seeing the business she invested in succeed.”
No. 22-2500 25

 The record also demonstrates that Jelena was an active in-
vestor who was intimately involved with the progress of the
PHMX Project. Shogher, Nick, and Kari all recounted conver-
sations with Jelena consistent with their understanding that
she initiated the wire transfers on her own—not on Zaric’s in-
structions. Text messages and emails between Kari and Jelena
conﬁrmed that Jelena was involved in invoicing and disburs-
ing funds for Pharmix’s various needs. We see no clear error
in the bankruptcy court’s ﬁnding that Jelena exercised suﬃ-
cient dominion and control in light of her position as an in-
vestor.
 * * *
 This evaluation under the Szaﬂarski factors supports the
bankruptcy court’s ﬁnding of Jelena’s equitable ownership in
the 50% stake in the PHMX project.
 First, Jorgovanka is Jelena’s mother, favoring Jelena’s eq-
uitable ownership. Second, the record lacked evidence that
Jorgovanka contributed ﬁnancially or otherwise to the PHMX
Project. The evidence also suggested that Jorgovanka was not
the true party in interest as to Jelena’s $773,250 in wire trans-
fers to Pharmix. Even more, Jorgovanka’s alternative explana-
tions for why she or Zaric is the equitable owner were not
credible and not supported by the evidence. Jelena’s evasive-
ness and omissions from her bankruptcy schedule further
tended to show that Jelena placed the PHMX stake in Jorgo-
vanka’s name in anticipation of collection activities—the third
factor. As noted above, we agree with the bankruptcy court
that the fourth factor, recording of conveyance, is irrelevant
and can be bypassed. On the ﬁfth factor, Jelena’s PHMX fund-
ing activities supported her dominion and control over the
company in line with her intended role as an investor.
26 No. 22-2500

 We aﬃrm the bankruptcy court’s ﬁnding that the Trustee
has met his burden of establishing Jelena’s equitable owner-
ship of the PHMX stake, which is therefore subject to turno-
ver. Accordingly, the district court properly aﬃrmed the
bankruptcy court’s factual ﬁndings.
 IV. Sanctions
 The Trustee seeks sanctions in our court, arguing that Jor-
govanka’s appeal is frivolous. Whether that standard is met
depends on whether Jorgovanka had a colorable legal argu-
ment to challenge the standard of proof for the turnover. She
did. And because the standard of proof necessarily impacts
how the evidence is weighed for proof of equitable owner-
ship, her factual challenge was not frivolous either.
 A court of appeals may issue sanctions if it “determines
that an appeal is frivolous.” FED. R. APP. P. 38. “An appeal is
frivolous if the appellant’s claims are cursory, totally unde-
veloped, or reassert a previously rejected version of the facts.”
McCurry v. Kenco Logistics Servs., LLC, 942 F.3d 783, 791 (7th
Cir. 2019) (citation omitted). “An appeal is also frivolous if it
presents arguments that are so insubstantial that they are
guaranteed to lose.” Id. Even after determining that an appeal
is frivolous, the appellate court’s decision to issue sanctions is
a matter of discretion. Burlington Northern R.R. Co. v. Woods,
480 U.S. 1, 4 (1987); Harris N.A. v. Hershey, 711 F.3d 794, 802
(7th Cir. 2013) (citations omitted). “We do not invoke Rule 38
lightly. Reasonable lawyers and parties often disagree on the
application of law in a particular case, and this court’s doors
are open to consider those disagreements brought to us in
good faith.” Harris, 711 F.3d at 801.
No. 22-2500 27

 The Trustee makes three arguments for sanctions: (1) Jor-
govanka’s arguments simply reassert a previously rejected
version of the facts by both the District Court and Bankruptcy
Court; (2) there was virtually no possibility of reversing the
Bankruptcy Court’s credibility ﬁndings on appeal; and
(3) Kelley foreclosed Jorgovanka’s arguments. But the frivolity
of this appeal—and thus the appropriateness of sanctions un-
der Rule 38—depends on whether Jorgovanka had a colorable
argument for a heightened standard of proof to be applied
here. As shown above in Section II, the standard of proof for
Section 542 turnovers was unsettled. In Kelley, we did not ad-
dress turnovers under Sections 542 and 541. Supra Section
II.C. And for the reasons stated above, Jorgovanka presented
colorable “legal contentions” that “are warranted … by a non-
frivolous argument for extending, modifying, or reversing ex-
isting law or for establishing new law.” FED. R. CIV. P. 11(b)(2).
So, the Trustee’s third argument fails, which also leads to the
failure of the other two.
 The Trustee asserts that Jorgovanka’s reassertion of her
version of the facts and challenges to credibility determina-
tions are frivolous and sanctionable. He relies on Jaworski v.
Master Hand Contractors, Inc., 882 F.3d 686, 691 (7th Cir. 2018)
to argue that an appeal is frivolous if the appellant simply
reasserts a previously rejected argument. In that case, we
mentioned that factor as one of many in assessing frivolity.
See Jaworski, 882 F.3d at 691. We did not rule that repeating
positions is a suﬃcient condition for sanctions under Rule 38.
“What is sanctionable is not merely repeating a losing argu-
ment. That is necessary to avoid waiver. What is sanctionable
is doing so while ‘fail[ing] to present any arguable reason why
the district court erred’ in rejecting the argument the ﬁrst
time.” H.A.L. NY Holdings, LLC v. Guinan, 958 F.3d 627, 636
28 No. 22-2500

(7th Cir. 2020) (alteration in original) (quoting Bugg v. Int’l Un-
ion of Allied Indus. Workers of Am., Local 507, 674 F.2d 595, 600
(7th Cir. 1982)).
 Jorgovanka may have repeated her legal arguments at
each court level. But she provided a colorable argument
that—even if the facts were weighed the same—she should
prevail on the higher standard of proof. That standard
necessarily changes how the evidence and related credibility
determinations weigh toward proof of Jelena’s equitable own-
ership. Given that the standard of proof was unsettled,
Jorgovanka’s appeal is not frivolous, even if just to preserve
her arguments for presentation to the Supreme Court. Nisen-
baum v. Milwaukee County, 333 F.3d 804, 809 (7th Cir. 2003)
(“[C]ourts do not penalize litigants who try to distinguish ad-
verse precedents, argue for the modiﬁcation of existing law,
or preserve positions for presentation to the Supreme
Court.”). “‘Frivolous,’ we stress, is not a synonym for ‘unsuc-
cessful,’ or ‘unlikely to succeed.’” Dolin v. GlaxoSmithKline
LLC, 951 F.3d 882, 887 (7th Cir. 2020) (citing NLRB v. Lucy El-
len Candy Div., 517 F.2d 551, 555 (7th Cir. 1975)). Even if the
standard of review for credibility and factual ﬁndings here is
“extraordinarily deferential,” it does not mean that Jorgo-
vanka did not “have the right to try.” Id.
 V. Conclusion
 For the reasons stated, we AFFIRM the district court’s aﬃr-
mance of the bankruptcy court’s judgment for the Trustee,
and we DENY the Trustee’s motion for sanctions.